UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

DUPONT WATER COMPANY INC.,            )
                                      )
                 Plaintiff,           )
                                      )
         v.                           )      No. 4:23-cv-00041-SEB-KMB
                                      )
CITY OF MADISON, INDIANA,             )
                                      )
                 Defendant.           )
_____)
                                      )
JEFFERSON COUNTY, INDIANA,            )
                                      )
                 Intervenor.          )

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This case involves a territorial dispute over water utility service in the City of Madison, Indiana. Plaintiff Dupont Water Company, Inc. ("Dupont") has brought this action against Defendant City of Madison ("Madison" or the "City") under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, alleging that the City has been providing water to the Jefferson County Jail (the "Jail"), as well as against non-party River City Printing LLC ("River City Printing"), for violations of Dupont's exclusive monopoly to provide water pursuant to 7 U.S.C. § 1926. Dupont seeks damages from the City for the alleged curtailment of Dupont's service area and a declaratory judgment that § 1926 prohibits the City from serving the Jail and River City Printing.

Jefferson County, Indiana ("Jefferson County" or the "County"), which operates the Jail, intervened in this litigation, seeking a declaratory judgment that its agreement to

1

receive water services from the City is legal; it also seeks to recover any damages it may incur as a result of Dupont's interference with that agreement.  In response to the County's intervenor complaint, Dupont filed a counterclaim under § 1983 and § 2201, alleging that the County's agreement to receive water services from the City also violates its rights under § 1926(b) and seeking a declaratory judgment to that effect, damages for lost revenue, and an injunction prohibiting the County from continuing to receive water service from the City.

Now before the Court are Dupont's Motion for Summary Judgment [Dkt. 97], Madison's Motion for Summary Judgment [Dkt. 106] and Jefferson County's Motion for Summary Judgment as to Dupont's counterclaims [Dkt. 109], respectively.  For the reasons detailed below, we GRANT IN PART AND DENY IN PART Dupont's motion, GRANT IN PART AND DENY IN PART Madison's motion, and GRANT Jefferson County's motion.

## Factual Background

### General Background

Plaintiff Dupont is an Indiana non-profit corporation providing water service to approximately 1,600 customers in Jefferson County, Indiana.  Dupont is owned by its members, who are its customers, and is run by an elected board of directors.  Dupont serves both residential and commercial customers.  Defendant Madison is a municipality located in Jefferson County that has provided water to customers in Jefferson County since 1852.  Intervenor Jefferson County is a municipal corporation under Indiana law.

**Plaintiff's Federal Indebtedness**

More than thirty years ago, in 1992, the United States Department of Agriculture ("USDA") loaned Dupont $571,500 under 7 U.S.C. § 1926 to construct waterworks improvements under a forty-year term. The term of that loan has not yet expired, and Dupont remains indebted to the USDA.

**The Water Purchase Contract**

Thirty years ago, in January 1993, Dupont and Madison executed a Water Purchase Contract (the "Contract"), under which Dupont was to purchase water from Madison. Under the Contract, Dupont maintains two points of connection in Jefferson County: the first on State Road No. 7, and the second at the intersection of Wilson Avenue and County Road 400N. Dupont and Madison have amended the Contract three times since its inception, most recently on January 17, 2007 (the "2007 Amendment"), which amendment provides that Dupont is authorized to purchase up to 15,000,000 gallons of water per month, with an option to purchase up to 18,000,000 gallons per month. The 2007 Amendment further allows Madison to directly serve certain users within Dupont's service area, including "two water users at the southeast corner of Wilson Avenue and Hutchinson Lane" as well as "industrial users north of Hutchinson Lane and into the Jefferson Proving Ground if such users require sprinkler systems or are large water users." Dupont purchases all the water that it resells from Madison under the Contract.

**The Jail Project**

In 2020, Jefferson County identified the property located at 1150 J.A. Berry Lane, Madison, Indiana, 47250, as the potential site of its future Criminal Justice Center (the "Jail"). At that time, Dupont had a water pipe on the north side of J.A. Berry Lane that it utilized to provide water to six users within one half-mile of the Jail's location, including the Frito Lay facility also located along J.A. Berry Lane approximately 400 feet west of the Jail. Dkt. 97-4 ¶¶ 9, 10. Dupont's water main consists of both three-inch and four-inch sections. *Id.* ¶¶ 6, 7.

Like Dupont, Madison has operated a water main near the Jail at all times relevant to this litigation. Specifically, Madison's twelve-inch water main is located on the south side of J.A. Berry Lane across the street from the Jail, as depicted below. The purpose of Dupont's water main is to loop Madison's water system; thus, in 2020, Madison did not serve any users directly off that water main. Jackson Dep. at 20–21.



The County began to purchase the Jail property in 2020, and to plan for the Jail's construction, including the Jail's water needs. The parties dispute the details regarding the first communications between Dupont and the County regarding water service at the Jail. Jefferson County Commissioners David Bramer, Ron Lee, and Robert Little have testified by affidavit that they contacted Dupont when the County began purchasing the property for the Jail and described the water service requirements for the Jail, including both water service and fire suppression. They also requested Dupont's rates and a plan for servicing the Jail's water needs when construction was completed. Shortly thereafter, the County engaged DLZ Corporation ("DLZ") to manage and coordinate construction of the Jail, and authorized and directed DLZ to communicate directly with Dupont about the Jail's water service needs.

Dupont claims, on the other hand, that it contacted Jefferson County regarding water service after first learning of the Jail construction project from a newspaper article. According to Dupont Board President Doug Hobbs, having become aware of the project, Dupont waited for the County to reach out to it and, when it did not do so, in July 2020, Mr. Hobbs contacted DLZ knowing "it takes some time to get this stuff together" and Dupont was "getting a little nervous about not hearing anything from the County." Hobbs Dep. at 48. On July 23, 2020, a DLZ engineer responded via email to Mr. Hobbs, stating that DLZ intended to have available within a few weeks initial information regarding the infrastructure requirements for the Jail's water needs, including preliminary line sizes, meter locations, backflow preventer types, and domestic and fire protection needs, and

5

that DLZ was "look[ing] forward to working with [Dupont] on the project." Dkt. 107-3 at Exh. V.

Several weeks later, on October 6, 2020, Commissioner Little texted Mr. Hobbs with contact information for DLZ's project manager who was overseeing the Jail construction. Mr. Hobbs, in turn, shared the project manager's contact information with Bryan Lane, who at that time was Dupont's water superintendent, allowing Mr. Lane to "work it out with [DLZ] what [Dupont was] going to do" with regard to the Jail's water service. Hobbs Dep. at 53. According to Mr. Hobbs, up to that point Dupont had been "kind of standing around" because the County had not yet officially requested water service from Dupont, and Dupont wanted to "get things rolling" given that construction of the Jail was "a pretty major project" and "the clock [was] ticking." *Id.* at 54. Mr. Hobbs enlisted Mr. Lane to "dig into" the Jail project "to find out what he could because [Dupont] didn't really have a customer order." *Id.*

Approximately one week later, on October 14, 2020, Mr. Lane contacted DLZ engineer Brian Maurovich to inform him that Dupont's Board would be holding a meeting on October 19 at which the Board planned to discuss a connection to Madison's 12-inch water main to provide water service to the Jail. Dkt. 107-7. At the October 19 meeting, as part of "Old Business," Mr. Hobbs and Mr. Lane shared that they had spoken with DLZ regarding the Jail project and learned that the Jail required 6-inch water lines. Dkt. 107-6 at Exh. Z. The minutes of that meeting do not include any reference to a discussion regarding Dupont's connecting to Madison's 12-inch line. *See id.*

On October 29, 2020, Mr. Maurovich emailed Mr. Lane to "follow up [on] previous conversations about water service to the new Jefferson County Jail site." Dkt. 107-9. Mr. Maurovich attached the water service layout proposed for the Jail to his email, noting that the layout included "an 8[-inch] fire protection loop around the site with the domestic and fire services lines branching off this loop," and inquiring whether the proposed alignment would "be an issue" for Dupont. *Id.* Mr. Maurovich reiterated that Dupont's 3-inch water main was "not sufficient for the site," and that it was his understanding that, while there had been discussions regarding Dupont connecting to Madison's 12-inch main, "no resolution has been made yet." *Id.* Mr. Maurovich requested that Dupont provide a resolution by November 6, 2020. *Id.* On November 11, 2020, Mr. Maurovich again emailed Mr. Lane "to confirm Dupont has talked to the City of Madison about the connection to the 12" main." Dkt. 107-11 at 2. In that message, Mr. Maurovich asked Mr. Lane if he could "provide any more detail" and estimate a date "when [Dupont] may have an answer to this." *Id.* There is no indication in the record before us that Mr. Lane ever responded to Mr. Maurovich's requests.

The following month, on December 21, 2020, Commissioner Lee texted Mr. Hobbs to discuss "water supply for the new jail." Dkt. 107-4 at Exh. A. After speaking on the phone, Commissioner Lee noted in a follow-up text that the "biggest thing will be requirement of line size – jail will need a 12[-]inch line." *Id.* Mr. Hobbs responded that Dupont "ha[d] been told a couple things on line size, but yes, it will have to be a large line. In fact, I believe it has to be 2 lines. One additional line for fire protection." *Id.*

A month later, on January 19, 2021, Dupont sent a letter to the Jefferson County's Commissioners stating that "it has come to our attention that the proposed Jefferson County Jail is located in the service area of Dupont Water Company that is protected pursuant to 7 U.S. Code § 1926(b)" and requesting that "the engineering company and other planners with respect to the [Jail] project contact Dupont Water Company with respect to planning for water service at the new jail site." Dkt. 107-12. The letter highlighted that Dupont "has a water line in place in front of the proposed jail site abutting J.A. Berry Lane." *Id.*

On February 4, 2021, Commissioner Bramer texted Mr. Hobbs to inquire whether Dupont had determined the water charge rate for the new Jail. Dkt. 107-3 ¶ 8. Mr. Hobbs responded that it would be about $2,000 per month. *Id.* A few days later, on February 9, 2021, the Jefferson County Council held a meeting at which they discussed the Jail project. The minutes from that meeting reflect that Commissioner Bramer notified the Council that the Commissioners had been in negotiations with local water companies "with the result being the Jail will use Dupont Water Co." Exh. DD to Ferguson Dep.

On February 22, 2021, Dupont received a letter from Midwestern Engineers Inc., that included a proposal "as requested" by Dupont for, *inter alia*, "evaluat[ing] water main sizing requirements for the soon to be constructed Jefferson County Jail." Dkt. 107-17. Midwestern Engineers proposed a preliminary plan for evaluating Dupont's hydraulics to "determine the size of water main required to service the proposed

development." *Id.* Ultimately, Dupont did not engage Midwestern Engineers to perform the proposed evaluation. Hendershot Dep. at 68.

In early March 2021, Commissioner Bramer sent a letter to Dupont regarding providing water service to the Jail stating that the Jail "is located within the Dupont Water Company district and the Jefferson County Commissioners are requesting rate information on the cost for water supplied to the new jail facility … by 18 March if possible." Ferguson Aff. ¶ 10; Exh. FF to Ferguson Dep. Commissioner Bramer further informed Dupont that the architect had estimated that "the facility will use 36,000 gallons per day based upon maximum capacity of the facility which is 300 inmates." *Id.* Around this same time, Commissioner Bramer sent a very similar letter to Madison, stating "[t]here [have] been discussions on which water company will supply water and the Jefferson County Commissioners are requesting rate information on the cost for water supplied to the new jail facility … by 18 March if possible." Dkt. 116-1.

The March 5, 2021 meeting minutes of the Jefferson County Commissioners reflect that Commission Bramer reported that "he has contacted the water companies, asking for rates." Dkt. 116-2. A few days later, on March 9, 2021, Madison's Utility Manager sent a letter to the Jefferson County Commissioners comparing Madison's and Dupont's water rates. Exh. 12 to Jackson Dep.

Commissioner Bramer attended Dupont's March 15, 2021 board meeting to discuss the Jail construction. He informed the Board that site preparation for the Jail would commence in May, that construction would take "22 to 24 months," that the Jail's water usage was "speculated to be 36,000 gallons a month at maximum capacity," and

that he would provide the Board "a spec sheet" and "a timeline" for the project.  Dkt. 107-16.  According to Dupont board member David Ferguson, "during the meeting, it was discussed that Dupont's current rate schedule did not have a rate tier beyond 20,000 gallons per month," meaning that "Dupont charge[d] the same amount per thousand gallons for all water taken over 20,000 gallons."  Ferguson Aff. ¶¶ 19, 20.  Mr. Ferguson further testified that, while there was discussion at the meeting of Dupont's potential increase of "an additional rate tier for high-volume users" such as the Jail, Dupont "did not have any obligation" to offer a special rate for the Jail.  *Id.* ¶¶ 21–22.  The minutes from the March 15 meeting state that Mr. Barlow would contact Sherman, Barber and Mullikan, an accounting firm in Madison, "about a rate schedule recommendation for the jail project."  Dkt. 107-16.

The next day, on March 16, at Commissioner Bramer's request, DLZ provided Dupont with both a hard copy and an electronic copy of the Jail project's specifications and drawings for the water system.  Bramer Aff. ¶ 12.  Dupont again discussed the Jail project at its April 19, 2021 board meeting.  The minutes from that meeting reflect that Mr. Lane was "working on a quote for a pit for the jail project" and that Sherman, Barber and Mullikan was "going to do a [rate] study for the jail project."  Dkt. 107-18.

Two months later, on May 11, 2021, at the Jefferson County Council meeting, Councilor Pam Crozier "asked the Council to revisit the water supply to the new jail that had been previously discussed in the February meeting" in light of the fact that "the City of Madison has presented a quote for water [and] sewage rate," but that, "as of March 18th Dupont Water had reported more time would be needed to quote a rate."  Dkt. 107-20.

According to Ms. Crozier, the Council was concerned that the opening of the Jail would be delayed if water service was not secured. Crozier Aff. ¶ 13. Following "much discussion" at the May 11 meeting, the Council voted unanimously to support "acquiring water and sewage service from the City of Madison." Dkt. 107-20.

The next day, on May 12, 2021, Kevin Mullikin, an accountant at Sherman, Barber and Mullikin sent an email to Mr. Hobbs and Robert Barlow, in relevant part stating as follows:

> I have made some progress on the rate calculation, but need some help from you Doug [Hobbs]. It appears that in order to serve the jail [Dupont is] going to have to build some infrastructure. I will need to know what that will cost, so can we get your engineer involved? The County used DLZ Engineering, so maybe they could also be involved in determining what will be needed and how it will be paid for. … Brian Jackson from the City told me that he will work with you all as much as possible, but that you can't just run a meter off of their main because of the fire protection requirements for the jail. He offered to meet with you and your engineer.
>
> Of course I can't determine a rate until we get that issue resolved. … Please let me know how you want to proceed.

Dkt. 107-19. Mr. Hobbs responded on May 17, 2021, informing Mr. Mullikin that he had forwarded the information request to Mr. Lane and would forward Mr. Lane's reply to Mr. Mullikin as soon as it was received. *Id.* That same day, Dupont's board directed its counsel (Mr. Barlow) to send a letter to the County Council and copy the County commissioners "to let them know our stance on the situation of rate and timeline of the jail water project." Dkt. 107-22.

In a May 25, 2021 letter directed to Ms. Cozier with the County Council, Mr. Barlow informed Jefferson County that Dupont was at that time conducting a rate study

11

"to formulate a rate appropriate for servicing such a large volume user as the proposed jail would be given the fact that the present rate schedule had a maximum rate at a relatively low volume."  Dkt. 107-23.  The letter noted that Dupont "is having the rate consultant prepare a volume rate for the sole purpose of selling water at a price lower per 1,000 gallons than would presently be the case if Jefferson County would simply purchase water based on Dupont's present rate schedule" and that it was "doing so in an effort to be a good corporate citizen and be fair to all concerned."  *Id.*  It is undisputed that no rate study was ever completed.  Hobbs Dep. at 73; Ferguson Dep. at 30.

On June 8, 2021, Jefferson County councilor Chris Shelton texted Mr. Ferguson to inquire whether there were any updates on the water supply situation.  Mr. Ferguson responded on June 21, 2021, indicating he had not "heard anything from anyone" and asking Mr. Shelton whether there was "[a]ny news from the council[.]"  Dkt. 107-24.  Mr. Shelton responded that same day, stating that the County was "still waiting on a quote" from Dupont for water service and asking Mr. Ferguson "whether it had been submitted yet[.]"  *Id.*  Nearly eleven months later, on May 3, 2022, Mr. Ferguson responded with only the name, "Doug Hobbs."  *Id.*

On July 20, 2021, Mr. Hobbs requested a progress report from Mr. Mullikin on the rate study for Dupont.  Mr. Mullikin responded providing usage and billing information and preliminary base cost calculations, but advised Mr. Hobbs that, "[a]s I think you know, I can't really go any further in making those calculations until we know what it will cost to put the facilities in place to serve the jail."  Dkt. 107-26.

Two weeks later, on August 4, 2021, Commissioner Bramer texted Mr. Ferguson (with Dupont) asking for an update so the County could "move forward with setting up the water supply infrastructure." Bramer Aff. ¶ 14. Mr. Ferguson responded saying that either Mr. Lane or Mr. Hobbs would provide an update, but, according to Commissioner Bramer, "neither individual ever responded with an update." *Id.*

In September 2021, Brian Jackson, the City's Utility Manager, met with Mr. Barlow, who was representing Dupont, to discuss water service to the Jail. According to Mr. Jackson, he informed Mr. Barlow at that time that Madison "would not authorize Dupont to use Madison's existing infrastructure to provide service to the Jail" and that Dupont "needed to hire an engineer to determine what infrastructure was needed and to determine how Dupont could provide service to the Jail." Jackson Aff. ¶ 11. The minutes from Dupont's September 20, 2021 board meeting reflect that the Board was informed that Mr. Jackson had "suggested for [Dupont] to get an engineer to meet with their engineer about specs of the job" and that Mr. Hobbs would "have a conversation with [Mr. Jackson] about the situation." Dkt. 107-27.

Approximately two months later, Commissioner Bramer attended Dupont's November 15, 2021 board meeting at which water service for the Jail was again discussed. According to Commissioner Bramer, he "repeated the County's request that Dupont provide water service" and Dupont responded that it was "still waiting to hear back about its rate study." Bramer Aff. ¶ 15. The minutes from the November 18, 2021 meeting of the Jefferson County Commissioners record that "[t]he County and Dupont Water have had ongoing discussions concerning supplying water to the new Jail facility"

13

and that Commissioner Bramer shared that, "Dupont Water reported in their meeting that an accurate rate assessment cannot be given at that this time." Dkt. 116-3. The minutes further reflect that "[t]he Water Board is currently waiting to receive the City of Madison's water cost update information to issue the new rate." *Id.*

On November 30, 2021, Madison's Mayor Bob Courtney sent Jefferson County an updated rate comparison that reflected "the actual Dupont Water rates," including the following rate comparison chart:

| City of Madison Water Rates | | Dupont Water Rates | |
| --- | --- | --- | --- |
| First 5,000 Gallons | $2.37 | First 3,000 Gallons | $9.68 |
| Next 15,000 Gallons | $2.05 | Next 3,000 Gallons | $7.61 |
| Next 30,000 Gallons | $1.75 | Next 4,000 Gallons | $6.13 |
| Over 50,000 Gallons | $1.47 | Next 10,000 Gallons | $4.95 |
| | | Over 20,000 Gallons | $4.37 |

Jackson Dep. at 76; Exhs. 16 and 17 to Jackson Dep.

In December 2021, Mr. Jackson on behalf of the City sent Jefferson County the City's policy that it provides fire protection to a customer only if that customer also receives water service from the City. Jackson Dep. at 80; Exh. 18 to Jackson Dep. Mayor Courtney also testified by deposition that the City's ordinances do not permit it to provide fire protection service to a customer that is not also receiving water service from the City. Courtney Dep. at 64.

At some point before construction on the Jail began, Dupont received a request for water service for use by the construction company at the Jail site and Dupont provided such service throughout the construction process. Hobbs Dep. at 94–95. Dupont claims,

14

however, that it never received an official request from the County to provide water service for the fully constructed Jail, and that, in December 2022, the County instead elected to receive water service from Madison. *Id.* at 94, 97.

According to Dupont, its procedures entail customers making requests for water service by completing an application for service, but Jefferson County never completed an application for the Jail. Ferguson Dep. at 74–75. The County represents that it was never provided an application nor informed by Dupont that it was required to complete such an application until after this litigation commenced. Dkt. 107-3 ¶ 17; Dkt. 107-4 ¶11; Dkt. 107-5 ¶ 13; Dkt. 107-13 at 74–75.

**River City Printing**

River City Printing is a private screen-printing business located in Madison's industrial park on property it purchased from Madison's Redevelopment Commission. Dkt. 107-2 at 77. At some point in early 2023, the owners of River City Printing contacted Madison to request water service. Dkt. 107-1 ¶ 12. Madison began providing water service to River City Printing on September 1, 2023, from its 12-inch water main. *Id.* ¶¶ 14–15.

**Plaintiff Files the Instant Lawsuit**

On January 25, 2023, Dupont's attorney sent a demand letter to Madison regarding the City's provision of water services to the Jail, informing the City that Dupont "has a water line in place which will be able to serve the Jail" and that "Dupont objects to, and plans to defend against, Madison's recent encroachment on its service territory." Dkt. 1-7. Madison's attorney responded to Dupont on February 10, 2023, stating that, "because

15

of Dupont's current inability to provide service and the prior agreement allowing Madison to provide water service, the claims asserted in the [demand] letter have no merit and Madison considers this matter closed."  Dkt. 1-8.

On March 17, 2023, Dupont filed the instant lawsuit against Madison, alleging that the City has been providing water to Jefferson County and River City Printing in violation of Dupont's exclusive, lawful monopoly to provide water under 7 U.S.C. § 1926.  In its complaint, Dupont alleged, *inter alia*, that it "has adequate pipes in the immediate vicinity of the Jail to provide it with service in a reasonable time," (Compl. ¶ 21), and that it "has the capability to provide the Jail when fully constructed with water service for both consumption and fire suppression," (*id.* ¶ 24).

**Post-Litigation Events**

In August 2023, Dupont contacted DLZ to request drawings of the Jail project, which DLZ had previously provided to Dupont two years prior, in March 2021.  Dkt. 107-29.  Mr. Maurovich from DLZ notified his colleagues of Dupont's request and "summarize[d] the issue" as follows: "Dupont could not provide the pressure or flow needed for the Jail as they only had a 3" water main near the Jail.  Shireman and the Commissioners had communication with Dupont on this issue.  Plans had been provided to Dupont back in March 2021. … We were directed by the Commissioners to connect to the City water main which is a 12" main south of JA Berry."  *Id.*

Approximately four months later, at Dupont's December 18, 2023 board meeting, the Board voted to "retain the services of an engineering firm to document that [Dupont] would be able to provide water service to the new jail."  Dkt. 107-30.

**The Expert Reports**

Lori Young, a Professional Engineer with Curry & Associates, Inc., was retained by Dupont to evaluate Dupont's capacity and capability of providing water service to the Jail. Robert Belluchi, a Professional Engineer with Commonwealth Engineers, Inc., was retained by Madison to respond to the report submitted by Ms. Young.

Ms. Young has opined that Dupont has adequate infrastructure to serve the Jail by implementing one of three options described below:



(Young Aff. Ex. 1 p.13.)

The first option identified by Ms. Young was to relocate Dupont's water meter connection with Madison from its current location at State Road 7 to J.A. Berry Lane, which is the meter directly in front of the Jail, utilizing Madison's 12-inch water main. It was Ms. Young's opinion that this option could be implemented within approximately

seven days at a cost of approximately $10,000.  Young Aff. ¶¶ 24, 26, 27; Dkt. 107-31 at 8.

The second option identified by Ms. Young was to relocate Dupont's current connection with Madison at State Road 7 to SR 7 near the intersection with J.A. Berry Lane.  Doing so would require replacing Dupont's existing 3-inch and 4-inch water mains with approximately 5,440 linear feet of 8-inch water main, along with fittings, valves, and hydrants.  Ms. Young estimated that replacing the water main could be accomplished in approximately 90 to 180 days.  *Id.* ¶ 31.

The third option that Ms. Young identified in her expert report was to activate Dupont's current connection to Madison's water meter located at Shun Pike and CR 400 North (Dawson Smith Road) and to construct approximately 5,420 linear feet of 8-inch water main, along with fittings, valves, and hydrants.  *Id.* ¶ 32.  Ms. Young opined that this project could be completed in approximately 90 to 180 days.  *Id.* ¶ 34.

Mr. Bellucci, however, opined that the total time necessary to design, finance, and construct the replacement water main required in the second and third options identified by Ms. Young could range from 12 to 18 months at a cost of approximately $703,300 for the second option and between $645,529.50 and $700,000 for the third option.  Bellucci Dep. at 25, 45, 67.

**The Instant Motions**

As noted above, Dupont filed its original complaint on March 17, 2023 against Madison, under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, alleging that the City has been providing water to the Jail and River City Printing in violation of Dupont's exclusive

18

monopoly to provide water granted pursuant to 7 U.S.C. § 1926.  Dupont seeks damages from the City for the alleged encroachment and a declaratory judgment that the City's actions violate § 1926.

Approximately one year later, on February 16, 2024, Jefferson County intervened in this litigation, seeking a declaratory judgment that its agreement to receive water services from the City is legal; it also seeks to recover any damages it may incur as a result of Dupont's interference with that agreement.  In response to the County's intervenor complaint, Dupont filed a counterclaim under § 1983 and § 2201, alleging that the County's agreement to receive water services from the City also violates its rights under § 1926(b) and seeking a declaratory judgment to that effect as well as damages for lost revenue and an injunction prohibiting the County from continuing to receive water service from the City.

Dupont amended its complaint on October 30, 2024, after the Court granted Madison's motion to dismiss Dupont's § 1983 claim alleged against it.  Now before the Court are the cross motions for summary judgment filed by Dupont [Dkt. 97] and Madison [Dkt. 106], and Jefferson County [Dkt. 109].  These motions are all fully briefed and ripe for ruling.

## <u>Legal Analysis</u>

### I.    **Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for

19

summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md. 1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant(s). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.    Discussion

Dupont seeks summary judgment on its claims against Madison and counterclaims against Jefferson County arguing that the undisputed evidence establishes that both have violated § 1926(b) and that each did so under an express policy such as is required to impose liability under § 1983. Madison rejoins that it is entitled to summary judgment on Dupont's claims because the 2007 Amendment permits Madison to provide water service

to the Jail and River City Printing as "industrial users," and, even if the Court disagrees, that it is nonetheless entitled to summary judgment because Dupont failed to establish that it made water service available as is required to enforce its rights under § 1926 and also failed to show that its alleged injury was caused by a City policy, practice, or custom as is required to hold Madison liable under § 1983. In addition to joining Madison's arguments in support of summary judgment, Jefferson County argues that, as a water customer, it cannot, as a matter of law, be deemed to have "curtailed" Dupont's service area as is required to violate § 1926(b), and that Dupont has failed to establish that the County acted with the requisite culpability necessary for liability under § 1983. We address these contentions and arguments in turn below.

### A.    The 2007 Amendment

We turn first to address whether the Jail and River City Printing come within the definition of "industrial user" as that term is used in the 2007 Amendment. If so, then Madison is contractually permitted to provide them water service and we need proceed no further. The specific provision in the 2007 Amendment at issue provides as follows: "Dupont Water does agree … to allow Madison to serve industrial users north of Hutchinson Lane and into the Jefferson Proving Ground if such users require sprinkler systems or are large water users." Dkt. 1-5 at 2.

"Under Indiana law, the 'goal in contract interpretation is to determine the intent of the parties at the time that they made the agreement." *Hess v. Biomet, Inc.*, 105 F.4th 912, 917–18 (7th Cir. 2024) (quoting *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 752 (Ind. 2018)). "Construction of the terms of a written contract generally is a pure

question of law," *Celadon Trucking Services, Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017); however, "[i]f contract language is ambiguous, … Indiana courts move beyond the contract's text, viewing the parties' intent as a question of fact to be informed by extrinsic evidence." *Hess*, 105 F.4th at 918 (citations omitted); *accord Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind. Ct. App. 2016) ("When the terms of a contract are ambiguous or uncertain, … and its interpretation requires extrinsic evidence, its construction is left to the factfinder.").

"'A word or phrase is ambiguous if reasonable people could differ as to its meaning'" but "[a] term is not ambiguous solely because the parties disagree about its meaning." *Celadon Trucking*, 70 N.E.3d at 839 (quoting *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans denied*.). "When summary judgment is granted based on the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that any contract ambiguity can be resolved without the aid of a factual determination." *Rusnak*, 55 N.E.3d at 840–41.

At issue here is the meaning of the term "industrial users" as used in the 2007 Amendment. Dupont argues that the term is unambiguous and thus should be given its plain and ordinary meaning while Madison and Jefferson County claim that the term is ambiguous because it is "undefined in the 2007 Amendment and 'reasonable minds could disagree on its meaning." Dkt. 108 at 19 (quoting *Panther Brands, LLC v. Indy Racing League, LLC*, 126 N.E.3d 898, 904–05 (Ind. Ct. App. 2019). Madison and Jefferson

County contend, therefore, that the Court should look beyond the four corners of the agreement and consider extrinsic evidence to determine the parties' intent.

While the 2007 Amendment does not contain a definition of the term, it is well-established under Indiana law that "a term is not ambiguous simply because it is not defined." *Bastin v. First Ind. Bank*, 694 N.E.2d 740, 746 (Ind. Ct. App. 1998), *trans denied*. "The general rule dealing with undefined words in contracts is to use the plain meaning of such words," *A.S. v. LaPorte Reg'l Health Sys., Inc.*, 921 N.E.2d 853, 858–59 (Ind. Ct. App. 2010), "unless it is clear from the entire contract and its subject matter that another meaning was intended." *Walker v. Trailer Transit, Inc.*, 1 F. Supp. 3d 879, 882 (S.D. Ind. 2014). "In order to determine the everyday ordinary and usual meaning of words, courts may properly consult English language dictionaries." *Ashlin Transp. Servs., Inc. v. Ind. Unemployment Ins. Bd.*, 637 N.E.2d 162, 167 (Ind. Ct. App. 1994).

To that end, the Merriam-Webster Dictionary defines "industrial" to mean "of or relating to industry," and the word "industry" as "manufacturing activity as a whole." *Merriam-Webster.com Dictionary*, Merriam Webster, https://www.merriam-webster.com/dictionary/industrial (last visited Sept. 30, 2025). This straightforward understanding of the term is reinforced when read in context with the remainder of the 2007 Amendment. Directly following the sentence in which the term "industrial user" appears, the 2007 Amendment provides that: "This provision [permitting Madison to provide water service to certain "industrial users"] shall also apply if the City of Madison acquires additional industrial park property." Dkt. 1-5. Given that the term "industrial user" is contained in a section of the contract referencing "industrial park property,"

23

which is land typically zoned and developed for production and manufacturing uses, this reinforces our conclusion that the parties intended the term "industrial user" to have its plain and ordinary meaning, which we find, based on the common understanding of the term "industrial," to be an entity engaged in some capacity in the activity of manufacturing or production.

Madison and Jefferson County argue that reasonable minds could differ on the definition of "industrial user," but do not specify how such differences might present. They reference nothing on the face of the contract that indicates the parties intended the term to have any special definition beyond its plain meaning. The only argument they advance with regard to an alternative definition relies on extrinsic evidence, which is improper given their inability to persuade the Court that the term is ambiguous.[1]

---

[1]    Even if we considered the extrinsic evidence presented by the parties, our conclusion would not change. Madison Ordinance Section 55.22(A)(3)(b), which was signed by Madison's Mayor at the time, Albert G. Huntington, within a few weeks of the 2007 Amendment, which was also signed by Mayor Huntington, includes definitions of various types of water users, including "industrial users" and "government users." *Id.* The ordinance defines an "industrial user" as "[a]ny establishment or place engaged in the processing or production of merchandise for personal, household or industrial consumption, and/or rendering service to others" and a "governmental user" as "[a] user engaged in legislative, judicial or administrative activities of federal, state and local governments, such as courthouses, police and fire stations, city halls, similar governmental users and water reseller companies." *Id.* Under these definitions, the Jail would clearly be a "government user" not an "industrial user." Although officially enacted shortly after the 2007 Amendment was signed, the fact that Madison adopted this ordinance contemporaneously with the 2007 Amendment supports the conclusion that Dupont and Madison intended "industrial user" to have a similar meaning in their contract, which is entirely consistent with the term's plain meaning.

   In contrast, the only extrinsic evidence of the parties' intent presented by Madison and Jefferson County is testimony from Dupont management that, while Dupont "does not have a definition for industrial user" and the "only thing that differentiates one customer from another is meter size," the water users it considers "business" or "industrial" customers typically have a larger meter size than "residential" customers. Ferguson Dep. at 26, 28. This vague distinction fails to illuminate the meaning Dupont and Madison intended to attach to the term "industrial user" as used in the 2007 Amendment, particularly without any evidence that Dupont had a

For these reasons, we hold that the term "industrial user" is unambiguous and should be given its plain and ordinary meaning as consistent with the above. Applying this plain reading of the term, no reasonable factfinder could conclude that the Jail, which is a government-run entity, uninvolved in the activities of production or manufacturing, satisfies the definition of "industrial user" as that term is used in the 2007 Amendment. Accordingly, Madison's and Jefferson County's contention that Madison is entitled to service the Jail under the 2007 Amendment fails. (We are tempted to say that "it doesn't hold water"!)

Likewise, we find that the 2007 Amendment does not permit Madison to provide River City Printing water service either. Even if River City Printing, which is engaged in the screen-printing business, could be deemed an "industrial user," the 2007 Amendment further provides that "industrial users" permitted to be serviced by Madison under the contract must also "require sprinkler systems" or be "large water users." Dkt. 1-5. There is no dispute here that River City Printing neither requires a sprinkler system nor is a large water user. While Madison argues that it is entitled to serve River City Printing based solely on the fact that it is located within the industrial park, the 2007 Amendment does not so provide. Rather, the 2007 Amendment states only that, in the event that Madison acquires additional industrial park property, the provision permitting Madison "to serve industrial users north of Hutchinson Lane and into the Jefferson Proving Ground if such users require sprinkler systems or are large water users" still applies, not

---

separate user class of "industrial users" for rate purposes or a specific definition of the term that it used in its business at the time the 2007 Amendment was signed.

that Madison is automatically permitted to service *any* new user in the expanded industrial park, regardless of whether it requires sprinklers or is a large water user. For these reasons, we hold that Madison has no contractual right under the 2007 Amendment to Dupont's and Madison's water purchase agreement to provide water service to the Jail or River City Printing.

### B. Section 1926(b)

We turn next to Dupont's declaratory judgment claims. Here, Dupont seeks declarations, first, that § 1926(b) prohibits Madison from serving the Jail or River City Printing, and second, that by agreeing to receive water service for the Jail from Madison, Jefferson County violated § 1926(b). Section 1926(a) empowers the USDA "to make or insure loans and to award grants to associations (including not-for-profit corporations and public agencies) to provide water or waste disposal facilities in rural communities." *Brown Cnty. Water Utility, Inc. v. Town of Nashville, Ind.*, No. 1:17-cv-02134-TWP-TAB, 2019 WL 2123461, at *6 (S.D. Ind. May 15, 2019). Section 1926(b) provides in relevant part that "[t]he service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body …." 7 U.S.C. § 1926(b). "[T]he purposes of § 1926(b) are to encourage rural water development and to safeguard the interest of the United States in having its loans repaid…." *Jennings Water, Inc. v. City of N. Vernon, Ind.*, 682 F. Supp. 421, 426 (S.D. Ind. 1988) (citation omitted).

To establish a violation of § 1926, a plaintiff must show that (1) it is rural water association within the meaning of the statute; (2) it has a qualifying outstanding loan

26

obligation; (3) it has provided or made service available to the disputed area; and (4) a competing entity curtailed or limited service in the area to which the plaintiff was providing service or making service available. *Brown Cnty. Water Util.*, 2019 WL 2123461, at *7 (citing *Jennings Water, Inc. v. N. Vernon*, 895 F.2d 311, 318 (7th Cir. 1989)). It is undisputed that Dupont is an "association" within the meaning of § 1926, and that it has a qualifying outstanding loan obligation. Regarding the Jail, Madison and Jefferson County claim that Dupont has failed to establish the third or fourth elements, to wit, that Dupont "made service available" or that a "competing entity curtailed or limited service." Madison argues that Dupont has also failed to establish that the City's provision of water service to River City Printing has "curtailed" Dupont's service area. We turn to these arguments below.

### 1. The Jail

Section 1926 does not specifically define what it means for an association to have "provided" or "made available" water service. "Although the Seventh Circuit has not explicitly stated how to determine when an association has 'provided or made available' service to a certain area, other circuits apply a two-pronged test." *Washington Cnty. Water Co. v. City of Sparta, Ill.*, 77 F.4th 519, 522 (7th Cir. 2023) (citation omitted). The first prong looks to whether the association has "pipes in the ground," meaning that it has "water pipes either within or adjacent to the disputed area before the allegedly encroaching association begins providing service to customers in the disputed area." *Id.* (quoting *Ross Cnty. Water Co. v. City of Chillicothe*, 666 F.3d 391, 399 (6th Cir. 2011)). For this prong of the test to be satisfied, "[t]he association seeking § 1926(b) protection

must also be capable of providing service to the disputed area within a reasonable time after a request for service occurs." *Ross Cnty. Water Co.*, 666 F.3d at 399. "This is essentially an inquiry into whether a water association has the capacity to provide water service to a given customer." *Deer Creek Water Corp. v. City of Oklahoma City*, 82 F.4th 972, 981 (10th Cir. 2023) (quoting *Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1203 (10th Cir. 1999)). The second prong requires the association to have the "legal right under state law to provide water to the disputed area." *Washington Cnty. Water Co.*, 77 F.4th at 522 (citation omitted).

Here, the parties dispute whether Dupont "made service available" to the Jail upon request as required to satisfy the first prong of the two-pronged test. Dupont argues that the undisputed evidence establishes that Jefferson County never officially requested water service, and thus, that Dupont's obligation under § 1926 to "make service available" by demonstrating that it either currently had the infrastructure to provide the water needed by the Jail or would be capable of providing service within a reasonable time was never triggered. Dupont further contends that it has shown, through its expert testimony, that once the County officially requested service, it could be prepared to provide such service within 180 days, at the latest, which it contends is a reasonable amount of time as a matter of law. Dupont thus maintains that it has demonstrated that it "made service available" to Jefferson County.

Madison and Jefferson County, on the other hand, argue that the record is replete with evidence establishing that the County requested service from Dupont time and again, beginning in late 2020, and that despite the County's repeated inquiries, Dupont

28

failed to take any steps to demonstrate that it could provide service within a reasonable time.  Instead, while Dupont repeatedly represented that it could provide the water capacity required by the Jail and that it was developing a high-volume user rate for the County to account for the large amount of water the Jail would require, Dupont never completed a rate study.  Additionally, despite Dupont's knowledge since at least 2021 that it did not then—and still does not now—have infrastructure in place that is capable of providing the amount of water required by the Jail, it failed even to commission an engineering study (until nine months after commencing this litigation) to demonstrate its ability to construct the necessary infrastructure to provide the Jail water service within a reasonable time following the County's requests for such information.  Madison and Jefferson County further argue that, given that the Jail is now fully constructed and operational, even assuming that Dupont could upgrade its infrastructure to satisfy the Jail's water needs within 180 days (which their expert disputes), such a delay is unreasonable as a matter of law.

In arguing that Jefferson County never requested water service, Dupont relies heavily on the fact that the County did not complete (or submit) a written application for service.  However, neither the language of § 1926 nor any of the case law cited by Dupont supports the conclusion that the statute or any precedential case requires a water user to request service in any particular manner, such as in writing, or by submitting a specific form or application.  To the extent that Dupont contends that its established practice was to require potential customers to complete a written application, Dupont has failed to adduce any evidence establishing that prior to filing the instant lawsuit it ever

specifically informed the County of that process or directed the County to complete an application in order to proceed further.

Dupont objects to much of the evidence adduced by Madison and Jefferson County in support of their claim that the County requested water service from Dupont before agreeing to accept service from Madison as inadmissible hearsay or testimony that contradicts the official minutes from Jefferson County Council meetings, which reflect only that the County had had "discussions" with Dupont regarding the provision of water service, not that an official request for water service was ever submitted to Dupont.

However, the undisputed evidence establishes that, in response to Dupont's January 19, 2021 letter to the Jefferson County's Commissioners stating that "it has come to our attention that the proposed Jefferson County Jail is located in the service area of Dupont Water Company that is protected pursuant to 7 U.S. Code § 1926(b)" and requesting that "the engineering company and other planners with respect to the [Jail] project contact Dupont Water Company with respect to planning for water service at the new jail site," Dkt. 107-12, the County did as Dupont requested. Official meeting minutes from both Jefferson County Council meetings and Dupont board meetings establish that, following receipt of Dupont's letter, Commissioner Bramer attended several Dupont board meetings at which he discussed Dupont's provision of water to the Jail, and that, by March 2021, the County had requested rates from Dupont and provided Dupont with the necessary details of the projected length of construction of the Jail and the Jail's water usage requirements. *See, e.g.*, Dkt. 107-16; Exh. FF to Ferguson Dep.

While Dupont argues that the County's failure to file a formal application for service is determinative of whether it can be found to have made a request for service under § 1926, we disagree. Given the County's repeated communications with Dupont throughout 2021 regarding water service, no reasonable jury could find that Dupont was unaware that the County was attempting to secure service for the Jail whose construction was underway. Yet Dupont never told the County that it would need to file an official application for water service before discussions could proceed further, but instead kept representing that it was pursuing a rate study to determine a high-volume rate for the Jail without ever completing such study. Meanwhile, despite knowing by early 2021 that, although it had "pipes in the ground" adjacent to the Jail, that its infrastructure was inadequate to service the Jail's needs, Dupont made no efforts until December 2023, *nine months after filing the instant lawsuit*, to commission an engineering study to determine what infrastructure would even be required to provide water service to the Jail and the amount of time it would need to provide the necessary infrastructure.

Given the uncontroverted evidence, no reasonable jury could find that Dupont "made service available" to the County when since at least early 2021 it has known that it does not have in place the infrastructure to service the Jail and yet took no steps until it commissioned an engineering study nine months after filing this litigation to determine whether it could even provide the service required. Accordingly, Madison and Jefferson County are entitled to summary judgment on Dupont's declaratory judgment claim as to Madison's provision of water service to the Jail.

## 2. River City Printing

With regard to Madison's provision of water service to River City Printing, Madison argues only that Dupont has failed to establish that the City curtailed or limited Dupont's service area under § 1926 in providing water to River City Printing because Madison had already been providing service to that area for approximately fifteen years before Dupont became indebted to the USDA. Thus, Madison asks, "How can Madison curtail an area before it exists?" Dkt. 108 at 26. This single rhetorical question is the extent of Madison's legal analysis on this claim.

The fact that Madison also has pipes in the area is not necessarily determinative so long as River City Printing is within Dupont's protected service area. "[C]ourts look to state law to define an association's protected service area under § 1926. In other words, a water district can only receive § 1926(b) protection for an area if it had a legal right under state law to serve that area at the time it assumed a qualifying loan." *Tri-Township Water Dist. v. City of Trenton, Ill.*, 576 F. Supp. 3d 591, 595 (S.D. Ill. 2021). Here, Madison puts forth no argument that, at the time Dupont assumed its qualifying loan, it did not have a legal right under state law to serve the area where River City Printing is located.

To the contrary, Madison does not dispute that Dupont has "pipes in the ground" within or adjacent to the area in which River City Printing is located, that Dupont has sufficient infrastructure to serve River City Printing's needs, and that Dupont has the "legal right under state law to provide water to the disputed area." *Washington Cnty. Water Co.*, 77 F.4th at 522. The undisputed evidence also establishes that by agreeing to provide River City Printing water service, Madison has curtailed or limited Dupont's

32

service area.  Accordingly, Dupont is entitled to summary judgment on its declaratory judgment claim as to Madison's provision of water service to River City Printing.

**B.    Section 1983**

Finally, we turn to Dupont's claim and counterclaim brought pursuant to § 1983 against Madison and Jefferson County, respectively.  Because we have held, as detailed above, that Madison and Jefferson County are entitled to summary judgment in their favor on Dupont's claim that Madison's provision of water service to the Jail is violative of federal law, Madison and Jefferson County are also entitled to summary judgment on Dupont's § 1983 claim based on that same theory.

Regarding Dupont's and Madison's cross motions for summary judgment on Dupont's § 1983 claim as applied to River City Printing, neither party adequately developed their arguments.  Rather, their briefs focus almost exclusively on the Jail.  Accordingly, neither side is entitled to summary judgment on Dupont's § 1983 claim as applied to River City Printing.

**III.    Conclusion**

For the reasons detailed above:

- Dupont's Motion for Summary Judgment on Count I of its complaint is GRANTED with regard to Madison's provision of water service to River City Printing and DENIED with regard to Madison's provision of water service to the Jail.  Madison's Cross Motion for Summary Judgment on Count I is correspondingly DENIED with regard to the provision of water

service to River City and <u>GRANTED</u> with regard to the provision of water service to the Jail.

- Dupont's Motion for Summary Judgment on Count II of its complaint is <u>DENIED</u>.  Madison's Cross Motion for Summary Judgment is also <u>DENIED</u> as to the City's provision of water service to River City Printing but <u>GRANTED</u> with regard to the City's provision of water service to the Jail.

- Dupont's Motion for Summary Judgment on Counts I and II of its counterclaim against Jefferson County is <u>DENIED</u> and Jefferson County's cross-motion for summary judgment on Dupont's counterclaim is <u>GRANTED</u>.

Accordingly, Dupont's § 1983 claim based on Madison's provision of water service to River City Printing, and the claims set forth in the Intervenor (Jefferson County) Complaint for Declaratory Judgment and Damages[2] remain for trial.  The case shall proceed accordingly.

IT IS SO ORDERED.

Date:  _____9/30/2025_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[2] In its complaint, Jefferson County seeks a declaratory judgment that is, in essence, the reverse of the declaratory judgment sought by Dupont in its counterclaim against Jefferson County. However, Jefferson County sought summary judgment only on Dupont's claims against it, not on its own claims against Dupont.  Dkt. 109.  Accordingly, Jefferson County's declaratory judgment and interference with contract claims remain in this lawsuit.

Distribution:

Bradley M. Dick
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
bdick@boselaw.com

Tristan Carl Fretwell
TAFT STETTINIUS & HOLLISTER LLP
tfretwell@taftlaw.com

Manuel Herceg
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mherceg@taftlaw.com

J. Christopher Janak
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jjanak@boselaw.com

R. Patrick Magrath
ALCORN SAGE SCHWARTZ MAGRATH LLC
magrath@advocatelawoffices.com

Jeffrey Wayne Parker, Jr.
Taft Stettinius & Hollister, LLP
jparker@taftlaw.com